# IN THE SUPREME COURT OF IOWA

No. 17 / 04-1361

Filed April 28, 2006

**STATE OF IOWA,**

Appellee,

vs.

**MARK STEVEN LECKINGTON,**

Appellant.

---

Appeal from the Iowa District Court for Scott County, Bobbi M. Alpers, Judge.

Defendant appeals his convictions for neglect of a dependent and child endangerment resulting in serious injury. **JUDGMENT OF DISTRICT COURT REVERSED; CASE REMANDED WITH DIRECTIONS.**

Linda Del Gallo, State Appellate Defender, and David Arthur Adams, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Kristin Guddall, Assistant Attorney General, William E. Davis, County Attorney, and Julie A. Walton, Assistant County Attorney, for appellee.

**STREIT, Justice.**

The defendant, Mark Leckington, was convicted of neglect of a dependent child and child endangerment resulting in serious injury for being involved in his wife's decision that endangered a drunken child. On appeal, Leckington contends there was insufficient evidence to prove he had custody or control of the child. After considering the arguments presented and reviewing the record made below, we conclude the evidence was insufficient to support a finding that Mark Leckington had custody or control of the child. This conclusion requires a reversal of both the neglect of a dependent child conviction and the child endangerment resulting in serious injury conviction. Consequently, we reverse the judgment of the district court.

## I.    Facts and Prior Proceedings

The facts in this case are the same as those set forth in *State v. Leckington*, 713 N.W.2d 208, 211 (Iowa 2006), a case we also decide today. We repeat only those facts necessary to our analysis of this case.

On a December afternoon in 2003, Sandra Leckington received a phone call from one of her son's friends, Dominic Major. Major told Sandra to come over to his apartment to pick up her son, Shawn Yuille, and one of his friends, Travis Talbot, because the boys had been drinking and Travis was "pretty trashed." Sandra got in her car and went to pick up the two thirteen-year-old boys. On the way to Major's apartment, Sandra stopped at the local convenience store and picked up her husband, Mark Leckington. Mark stayed in the car while Sandra went into Major's apartment to get the boys. As the two boys emerged from the apartment, Mark noticed Travis was wobbling, and that Major had to eventually carry Travis to the car. Once Travis was placed in the back seat of the car, he immediately slumped over. One witness thought

Travis was unconscious by the time he entered the car. Mark asked whether Travis had been drinking, and Sandra told him that Travis had not been drinking. Mark then asked Shawn what was wrong with Travis. Shawn told him that Travis had hit his head while wrestling around in the apartment. After a brief discussion, they drove around the block to the Leckington home. According to Sandra, Mark, and Shawn, Travis walked, unaided, out of the car and into the home. Mark and Sandra watched the boys enter the home and then drove away to run some errands.

Once inside the Leckington home, Travis collapsed on the kitchen floor. Shawn went back to Major's apartment for help, and he was told to give Travis milk. When this did not work, he went back outside and found some friends to help carry Travis upstairs to the bathtub. The boys then ran cold water on Travis in hopes of reviving him. Travis's eyes remained open, but he began to foam at the mouth.

Approximately an hour after they had left the boys at their home, Sandra and Mark returned home. Mark went to a room in the back of the house. One of the children in the house told Sandra that Travis was "dead" and lying in the bathtub. After an inexplicable delay,[1] Sandra told Mark about Travis, and he told her to call Travis's mother.

Travis was rushed to University of Iowa Hospitals and Clinics in Iowa City via helicopter and placed in pediatric intensive care. He regained consciousness after fourteen hours and remained at the hospital for three days. A doctor testified that his blood-alcohol level was

---

[1]When Sandra saw Travis lying in the bathtub, she "freaked out." She told the boys they had to get Travis out of the bathtub and out of the house. While moving Travis out of the tub, Sandra proclaimed "You know how much trouble I'm going to get into, this little f***er had to drink alcohol, I'm not going to jail for this motherf***ing bastard." Sandra helped drag Travis down the stairs, but the boys refused to help her put Travis outside in the cold December air.

approximately .3, and that he was at risk of death from the high level of alcohol in his blood.

The State charged Mark with the offenses of child endangerment resulting in serious injury and neglect or abandonment of a dependent person. *See* Iowa Code §§ 726.3, .6 (2003). The State charged Sandra with the same crimes, and with the additional charge of providing alcohol to a minor resulting in serious injury. *See id.* § 123.47(5).

Mark and Sandra were tried in a joint trial. The jury found Mark and Sandra each guilty of child endangerment resulting in serious injury and neglect of a dependent child. The jury also found Sandra guilty of providing alcohol to a minor. Mark received two, ten-year, consecutive sentences for his crimes.

On appeal, Mark contends there was insufficient evidence to support his convictions. He emphasizes he was not present when Travis consumed the alcohol, he was only a passenger in the car, and he never did anything to assume responsibility for Travis. He also argues there was no evidence that he knowingly created a risk endangering Travis, or knowingly exposed him to a hazard. Mark also contends his trial counsel was ineffective in failing to make a motion to sever his trial from that of his wife. He additionally argues the court abused its discretion in imposing consecutive ten-year sentences given the circumstances of the case. Because the sufficiency-of-the-evidence claim is dispositive, we do not reach his other arguments on this appeal.

## II. Discussion

### A. Sufficiency-of-the-Evidence Claim

Mark made a motion for judgment of acquittal asserting there was insufficient evidence to support the charges against him. He raises the same argument on appeal.

### 1. Scope of Review

Review of sufficiency-of-evidence claims is for errors at law. *State v. Petithory*, 702 N.W.2d 854, 856 (Iowa 2005). The verdict must be supported by substantial evidence which is "such evidence as could convince a rational trier of fact that [the] defendant is guilty beyond a reasonable doubt." *State v. Robinson*, 288 N.W.2d 337, 339 (Iowa 1980); *State v. Query*, 594 N.W.2d 438, 445 (Iowa Ct. App. 1999) (stating the jury's findings of guilt are binding if supported by substantial evidence). In determining whether there is substantial evidence, the record is viewed in a light most favorable to the State, and this includes all legitimate inferences that may fairly and reasonably be deduced from the evidence. *State v. Casady*, 597 N.W.2d 801, 804 (Iowa 1999). We consider all the evidence presented, not just that of an inculpatory nature. *State v. Randle*, 555 N.W.2d 666, 671 (Iowa 1996). Evidence that only raises suspicion, speculation, or conjecture is not substantial. *State v. Thomas*, 561 N.W.2d 37, 39 (Iowa 1997).

### 2. Neglect or Abandonment of a Dependent Person

The elements of the crime of neglect of a dependent child are set forth in Iowa Code section 726.3. The relevant portion states:

> A person who is the father, mother, or *some other person having custody* of a child[2] . . . who knowingly or recklessly exposes such person to a hazard or danger against which such person cannot reasonably be expected to protect such person's self or who deserts or abandons such person, knowing or having reason to believe that the person will be exposed to such hazard or danger, commits a class "C" felony.

---

[2]A child is defined in Iowa Code section 702.5 as any person under the age of fourteen.

Iowa Code § 726.3 (emphasis added). The term "custody," as it pertains to neglect or abandonment of a dependent person, is not defined in the Iowa Code. Two cases guide our analysis of the term "custody."

In *State v. Sparegrove*, 134 Iowa 599, 600, 112 N.W. 83, 84 (1907), the State charged an individual with "exposing and abandoning a child," a predecessor to section 726.3, when he abandoned a baby on a woman's doorstep at the direction of the baby's parents. The applicable code provision provided as follows:

> If the father or mother of any child under the age of 6 years, *or any person to whom such child has been intrusted or confided*, expose such child in any highway, street, field or outhouse, or in any other place with intent wholly to abandon it, he or she, upon conviction thereof, shall be imprisoned in the penitentiary not exceeding 5 years.

Iowa Code § 4766 (1897) (emphasis added). The defendant argued the language "intrusted or confided" only referred to situations in which an individual held legal custody of a child. *Sparegrove*, 134 Iowa at 601, 112 N.W. at 84. We held that the statute was not so limited and concluded that the State properly charged the defendant with the crime because he "undertook . . . to take charge of [the baby] and care for it." *Id.*

In *State v. Johnson*, 528 N.W.2d 638 (Iowa 1995), we analyzed the term "custody" within the current statute. In *Johnson*, the defendant, Paula, provided the daily care and maintenance for her husband, Wallace, who suffered from Parkinson's disease, hypertension, depression, and hyperuricemia. 528 N.W.2d at 639. One day, Wallace fell to the floor and was unable to get back up. He yelled to Paula for assistance and, after about an hour, Paula came and kicked and punched him in the face. After Paula left, Wallace called a friend and told him to call "911." Paramedics and police arrived at the scene after

Paula had returned home. Paula told the paramedics she was the only person living at the address. However, Wallace made noises in the background and the paramedics entered to find Wallace lying on the floor with a broken nose and lacerations on his ears. The State charged Paula with, among other things, neglect or abandonment of a dependent person. *Id.* The district court dismissed the charge of neglect or abandonment of a dependent person on the ground that custody, an element of the crime, required the existence of *legal* custody. *Id.* at 640. We disagreed. We determined the legislature's use of the phrase "custody" in section 726.3 did not mean legal custody. *Id.* at 641. Citing *Sparegrove*, we concluded "custody" in the context of chapter 726 meant "[t]o be in charge of an individual and to hold the responsibility to care for that individual." *Id.* We therefore reversed the trial court's dismissal of the charge of neglect or abandonment of a dependent person. *Id.* at 642.

In the present case, Mark contends the State did not prove he had custody of Travis for the purposes of this crime. The State argues Mark had custody because he undertook the supervision of, and responsibility for, Travis. The State claims Mark had custody of Travis during at least three points in time. First, when Mark allowed Travis in the car; second, when he took Travis to the Leckington home and left him there with no other adults present; and finally, when he did not immediately call for help when he came back home.

The first and third arguments are without merit. First, merely allowing a minor into a car does not establish a custodial relationship. The third argument—Mark did not immediately call for help—is not supported by the record. All of the evidence indicates that Mark went to a different part of the home as soon as he and Sandra returned home

from running errands. A child then approached Sandra and told her that Travis was "dead" in the bathtub. Mark remained unaware of the situation until Sandra came and told him about it. As soon as Mark found out, he instructed Sandra to call Travis's mother. There was no evidence to support a finding that Mark did anything to purposefully delay medical attention for Travis, and therefore no evidence to conclude he personally took charge of Travis's well being.

The State's second argument—Mark took charge of Travis and had the responsibility to care for him when he actively participated in the decision to leave Travis at the Leckington home—requires more analysis.

The State contends Mark's testimony about what happened during the brief car ride illustrates Mark was actively involved in the decision to leave Travis at his unsupervised home. The State points to the following testimony by Mark:

> Well, I said, So what is going on, to Sandi, and she says, I don't know. I said, What are you guys planning on doing? And they wanted to go to our house to play PlayStation. Well, with the kids that were at home, and being Brandon was there, I said, Call Travis's mom and dad, see if they're home, because I really don't want Travis over at the house without us being there. Which I did not know that he had spent the night that night before anyway. And Sandi had tried calling Travis's parents, got no answer. I ain't going to abandon a child out on the street, you know, saying, no, you can't come over to our house. I just said, We got some things we got to do, me and Sandi got to go and do some things, will you guys promise me that you'll behave?

After the boys promised they would behave, Mark told the boys to stay downstairs away from the other children in the home. Mark then testified "Me and Sandi stayed until they got in the porch area. I made sure they were in the back door of the house. Once I saw the back kitchen door close, that's when we left." The State argues that once the

Leckingtons left Travis at their own home, without adult supervision, Mark and Sandra *both* undertook charge of Travis.

The State makes a persuasive argument that Sandra decided to take charge of the care and responsibility of Travis, but the record does not support such a finding for Mark.

In fact, the evidence shows Mark had very little involvement in the decision to pick up Travis and the decision to leave Travis at the Leckington home. Dominic Major called Sandra and told her to pick up her son and Travis. On the way to Major's apartment, Sandra stopped and picked up Mark at the convenience store. Mark remained in the car while Sandra went inside to retrieve the boys. Neither Mark's inquiry about Travis's condition nor his further inquiry about what the boys planned to do next demonstrate Mark made the conscious choice to place the boys at the Leckington home. While there was at least some dispute as to who drove the vehicle,[3] the State presented insufficient evidence to conclude Mark decided what to do with Travis. At best, Mark acquiesced in *Sandra's* decision to move the children to their home. Without proof that Mark played a significant role in the decision to move Travis, there is not enough evidence to find Mark was in charge of Travis, and therefore insufficient evidence to support a finding that Mark had custody of Travis.

### 3. Child Endangerment Resulting in Serious Injury

The crime of child endangerment resulting in serious injury is set forth in Iowa Code section 726.6. The relevant portions of this statute state:

---

[3]Sandra, Mark, Dominic Major, and Major's roommate all testified that Sandra was the driver. On the other hand, Kara Lake, a neighbor viewing the incident from the doorway of her apartment, testified the driver was male.

1. A person who is the parent, guardian, or person having *custody or control* over a child . . . commits child endangerment when the person does any of the following:

. . . .

*a.* Knowingly acts in a manner that creates a substantial risk to a child or minor's physical, mental or emotional health or safety.

. . . .

*d.* Willfully deprives a child or minor of necessary food, clothing, shelter, health care or supervision appropriate to the child or minor's age, when the person is reasonably able to make the necessary provisions and which deprivation substantially harms the child or minor's physical, mental or emotional health.

Iowa Code § 726.6(1) (emphasis added). In order to sustain a conviction for child endangerment resulting in serious injury, the State must prove, beyond a reasonable doubt, Mark had either control or custody of Travis. We discuss control and custody separately.

### a. Control

Iowa Code section 726.6(3) states a person has "control" for the purposes of child endangerment if he or she has: (1) "accepted, undertaken, or assumed supervision" of a child from the parent or guardian of the child; (2) "undertaken or assumed temporary supervision of a child without explicit consent from the parent or guardian of the child"; or (3) operated a motor vehicle with a child present in the vehicle.

The district court did not instruct the jury on the third definition of control. Also, there was no evidence to prove Mark accepted, undertook, or assumed supervision of Travis with the consent of Travis's parents or guardians. Therefore, we must analyze whether Mark undertook or assumed the temporary supervision of Travis without the explicit consent of Travis's parents or guardians.

Mark claims his mere presence as an adult in the vehicle does not mean he had control of Travis for even a brief period of time. We agree. Mark's role in this situation was peripheral. He did not decide to pick up the boys; he did not decide where to leave the boys. At best he acquiesced in his wife's decision to leave the boys at the Leckington home. His inactivity does not rise to the level of control.

### b. Custody

As noted above, chapter 726, "Protection of the Family and Dependent Persons," does not define the term custody. In *Johnson*, we equated the term "custody" in section 726.3 (neglect of a dependent child) with the term custody in section 726.6 (child endangerment resulting in serious injury). 528 N.W.2d at 641. Because we have already concluded Mark did not have custody of Travis for purposes of neglect or abandonment of a dependent person, we must also find he did not have custody for the purposes of the crime of child endangerment resulting in serious injury.

### III. Conclusion

Our decision does not condone Mark Leckington's behavior. The level of indifference he displayed towards the health and welfare of a child was appalling, but his actions (or inaction) did not rise to the level of criminal liability. The evidence was not sufficient to establish the elements of custody or control for either crime. Therefore, the State failed, as a matter of law, to tender substantial proof on each of the essential elements of the offenses. We reverse the district court's judgment of conviction and remand for entry of a judgment of acquittal.

**JUDGMENT OF DISTRICT COURT REVERSED; CASE REMANDED WITH DIRECTIONS.**